Gerald S. MAYKUTH, d/b/a Bighorn
Beverage, Plaintiff-Appellant,

v.

ADOLPH COORS COMPANY, a Colorado Corporation, Defendant-Appellee.

No. 81–3152.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 9, 1982.

Decided Oct. 19, 1982.

C. W. Leaphart, Jr., Helena, Mont., argued, for plaintiff-appellant; W. William Leaphart, Helena, Mont., on brief.

Leo Bradley, Golden, Colo., argued, for defendant-appellee; Richard F. Cebull, Anderson, Brown, Gerbase, Cebull & Jones, P. C., Billings, Mont., on brief.

Before HUG, SKOPIL and FLETCHER, Circuit Judges.

HUG, Circuit Judge:

Gerald Maykuth operated Bighorn Beverage, a wholesale beer distributorship, pursuant to a contract with Adolph Coors Company ("Coors"). When Coors terminated Maykuth as a distributor, he brought this action, claiming the termination breached their contract and violated Montana statutes regulating the distribution of beer. Maykuth also alleged violations of the Sherman Act, 15 U.S.C. § 1.

We affirm the district court's determination that Maykuth failed to establish Coors's liability under the antitrust laws. However, we hold that Coors did breach Maykuth's contractual and statutory rights and is liable for damages on those claims. We also reverse the district court's conclusion that Maykuth is liable to Coors for breach of contract.

I

FACTS

In 1976, Coors began marketing its products in Montana. Maykuth applied for a distributorship in the Helena area. The company required dealers to maintain a refrigerated warehouse with a recycling facility, and to acquire refrigerated trucks and other specialized delivery equipment. Maykuth's application included his plans for developing and financing the required facility and equipment. On the basis of that application, Coors awarded Maykuth a distributorship by a contract executed in January, 1977. Maykuth developed a "model facili-

ty" and purchased the necessary equipment, incurring expenses of approximately $600,-000.

The contract terms were consistent with Coors's policy of closely regulating the distribution and marketing of its products. The company maintained that the beer's unique qualities required Coors to restrict areas in which it was distributed and to impose strict quality controls. It vigorously opposed any distribution of its products outside of designated distribution territories. Each distributor was therefore limited to a specific marketing territory and was required by the contract to assume responsibility for quality control of all the beer it sold.

The new business did not prosper. Maykuth attributed its financial problems to Coors's failure to resolve union disputes, Coors's test-marketing in Montana of the "ecology press-tab can," and Coors's more favorable treatment of other dealers, including provision of advertising and credit services. Coors denied these claims, contending that Maykuth's unrealistic market projections, his improvident financing arrangements, and his failure to promote sales aggressively had caused the failure of the business. Maykuth attempted to improve sales through a series of price promotions. His pricing policies resulted in increased sales, but the business continued to operate at a loss.

In June, 1978, Maykuth was contacted by John Bennett, a "beer broker," who wanted to purchase Coors beer for sale outside Montana. Maykuth originally refused to sell to Bennett, fearing such a sale would violate state licensing requirements. He advised Coors that Bennett had contacted him. He also discussed the proposed sale with state officials, who advised him that state liquor regulations did not prohibit retailers from selling beer to purchasers who planned to distribute it out of state. Maykuth specifically outlined to the state liquor control administration a plan whereby he would sell beer by the truckload to one of his licensed retail customers, Super Save, which in turn would sell the beer to Bennett. Assured by the liquor control admin-

istration that this plan did not violate state law, Maykuth agreed to sell large shipments of beer to Super Save for resale to Bennett.

Maykuth sold eight semi-trailer loads under this agreement, loading Bennett's trucks at Maykuth's dock and riding in the truck to Super Save, where he signed over the bill of lading. The first six sales to Bennett went as planned. Drivers of the last two shipments, destined for Alabama, decided to stop at the Coors brewery in Colorado to exchange Coors's unique plastic pallets for regular wooden ones. Coors intercepted 4,080 cases of the beer, which were being transported without refrigeration, and took possession of them. The beer was traced to Maykuth. Coors's counsel contacted him, demanding that he reclaim the beer and return it to Helena for distribution. Maykuth refused; he took the position that the sale of the beer to Super Save had terminated his responsibility for it.

Immediately after this incident, Coors decided to terminate Maykuth's distributorship. He was advised by letter on August 28, 1978 that he was terminated as of August 31 for "lack of veracity." Maykuth then filed this action.

Count one of Maykuth's complaint, which invoked the district court's diversity jurisdiction, claimed breach of contract. Count two, also alleging diversity, charged violations of dealer-protective provisions of the Montana statutes regulating the distribution of beer. Counts three and four alleged violations of the Sherman Act, 15 U.S.C. § 1. Maykuth claimed the termination resulted from his refusal to comply with Coors's price fixing policy and its unlawful territorial restraints. Coors denied each of these claims and asserted a counterclaim demanding damages for Maykuth's breach of the agreement.

After a bench trial, Coors was awarded judgment on each of these claims. Maykuth appeals.

## II

### COUNTS ONE and TWO

Maykuth's breach of contract and state statutory claims challenge the manner in

which Coors cancelled his distributorship. He claims that because the termination was without good cause and without sufficient notice, it violated contractual and statutory provisions intended to protect the distributor.

The distributorship contract permitted termination on three different bases. Under ¶ II(1), a distributor could be terminated immediately for specified highly egregious conduct, including commission of a felony, conduct constituting moral turpitude, and revocation of a state liquor license.[1]

The second termination provision, which appeared in ¶ IX(1), allowed for termination by either party on thirty days' notice. The terminating party was not required to specify a cause for the cancellation. A distributor terminated under this clause could invoke a separate provision, ¶ VIII(2), that required Coors to purchase the business's assets (the "buy out" provision).[2]

The third basis for termination, ¶ IX(2), involved breach of the contract. If Coors determined a breach had occurred, it was required to serve notice on the distributor and allow him ninety days to cure the breach. As an additional protection, a distributor who received notice of breach under this clause could demand arbitration under ¶ XV. The purpose of the arbitration was to determine if "proper cause" existed for termination.[3]

These contract provisions must be read in conjunction with the statutory scheme that regulates the distribution of beer in Montana. A notice requirement for distributor terminations is set out in Mont.Rev. Codes Ann. § 16–3–222, which provides in part:

All contracts, agreements, or franchises between a brewer and a wholesaler shall specifically set forth or contain the following:

... (5) a termination clause providing that the brewer shall deliver, in writ-

---

1. ¶ II(1) provides in full:

   The Distributor agrees:

   (1) At all times to be aware of and adhere to all local, state, and Federal laws and regulations applicable to Distributor's business pursuant to this Agreement. Violation of said laws and regulations, dishonesty, conduct involving moral turpitude, conviction of a felony, infamous crime, or any Federal crime which is punishable in a Federal penitentiary, revocation, nonrenewal or suspension of Distributor's federal, state or local license or permit, all shall be causes for immediate termination of Distributor at the option of Coors. In such event, Coors shall have the right to make whatever immediate arrangements it deems necessary or expedient to provide for the sale and distribution of Coors beer products in Distributor's area. Any insolvency of Distributor, institution of proceedings in bankruptcy by or against Distributor, receivership or dissolution of Distributor, assignment for benefit of creditors pursuant to insolvency or liquidation by Distributor, shall also be cause for such immediate termination by Coors.

2. ¶ IX(1) provides:

   This Agreement may be terminated by either party by the service upon the other party of at least 30 days advance written notice of termination.

   ¶ VIII(2) provides:

   In the event that Coors terminates Distributor pursuant to Article IX(1) hereinbelow, *Distributor shall have, for a period of 30 days* after the mailing of the termination notice,

the option to require that Coors purchase certain assets of the Distributorship upon the following terms:

Payment by Coors in cash, free and clear of all liens and encumbrances:

(a) The fair market value of the assets used by Distributor to distribute Coors beer only.

(b) The cost of inventory of Coors products of Distributor on hand on effective date of termination.

(c) Goodwill of the distributorship in an amount equal to one-twelfth of the previous full twelve months' Coors sales of the Distributorship.

3. ¶ IX(2) provides:

   If Coors shall determine that Distributor has breached or is in default of any term or condition of this Agreement, then Coors shall so notify Distributor in writing specifying the grounds constituting such breach or default. Thereupon, except as provided in Paragraph II(1) herein, Distributor shall have a period of time, not more than 90 days from receipt of such notice by Distributor, within which to correct such breach or default to Coors' satisfaction. In the event that Distributor shall fail or refuse to correct such breach or default to Coors' satisfaction within the said time period, or as the same may be extended by Coors at its discretion, Coors shall have the right to terminate the Distributor.

ing, to the wholesaler a 60-day notice of intent to terminate the agreement, contract, or franchise.

The statutes also require the brewer to state the cause for the termination and to allow the distributor to attempt to cure the default. Mont.Rev. Code Ann. § 16–3–221 states that: "It is unlawful for any brewer [to] . . . (4) cancel or terminate, *except for just cause* . . . any agreement or contract, written or oral, or the franchise of any wholesaler . . . ." (Emphasis added.) Section 16–3–222(4) requires that the contract include a procedure for review and specification of wholesaler deficiencies and "that a reasonable period of time shall be given the wholesaler for rectification of said deficiencies prior to any notice of intent to terminate." Finally, the statutes provide that all these statutory protections shall be incorporated into the contract, whether or not the writing expressly includes them.

The district court concluded that incorporation of the statutory provisions into the contract was necessary. However, it failed to determine the application of the statutes to each of the contract's termination provisions. We now consider that application.

■ The provision in ¶ IX(1) for termination on thirty days' notice without cause cannot be reconciled with the statutes' cause and notice requirements. We therefore conclude that it is invalid, and could not have been the basis for a lawful termination of the contract.

■ The ¶ IX(2) provision, which allows for termination in the event of a contract breach, satisfies the statutory requirements. It allows termination only for cause and includes the procedure for notification of default and opportunity to cure required by section 16–3–222(4). In addition, it gives the distributor the contractual protections of a ninety-day period to cure the default and the option to demand arbitration. ¶ IX(2) is thus an enforceable termination provision.

The ¶ II(1) provision allows immediate termination for certain conduct. The "just cause" requirement of section 16–3–221(4) must be applied to this provision also. Therefore, reliance upon one of the acts specified in this clause would not relieve Coors of the obligation to show that the termination was justified by proper cause.[4]

■ The district court concluded that in terminating Maykuth for "lack of veracity," Coors was enforcing the provisions of ¶ II(1). Among the acts specified in that clause is "dishonesty." The district court's conclusion as to the proper interpretation of this contract provision is a question of law freely reviewable by this court. *Martin v. United States,* 649 F.2d 701, 703 (9th Cir. 1981); *Kittitas Reclamation District v. Sunnyside Valley Irrigation District,* 626 F.2d 95, 98 (9th Cir. 1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 861, 66 L.Ed.2d 802 (1981). We conclude that the district court's interpretation was incorrect.

■ The inclusion of the term "dishonesty" among the acts specified in ¶ II(1) clearly contemplates an extremely serious act, for it is listed with the commission of a felony and other violations of state and federal law. Enforcement of the provision invokes a very serious penalty: it deprives the distributor of all his contractual rights. Termination under this provision is thus in the nature of a forfeiture, a penalty that the law abhors.

These facts do not justify a forfeiture of all contract rights and benefits. The acts of dishonesty on which Coors relies are variously identified as Maykuth's decision to participate in the out-of-state sale, his failure to adequately explain the increased sales to Super Save, and his response to the demand of Coors's counsel that he retrieve the beer intercepted by Coors in Colorado. None of these acts is as egregious as the serious violations of law listed in ¶ II(1) of the agreement. Rather than unlawful acts, Maykuth's conduct at most constitutes a

---

4. Because of the conclusions we reach here, we need not consider whether immediate termination, without notice or opportunity to cure, would be permitted by the statutes under some circumstances.

breach of contract. His conduct is not of the same magnitude as the acts specified in that clause. We therefore conclude that ¶ II(1) cannot reasonably be interpreted to permit termination of the distributorship for this conduct.

If Maykuth's participation in the sale to Bennett did breach the terms of the agreement,[5] such a breach would permit enforcement of ¶ IX(2). On these facts, ¶ IX(2) was Coors's only lawful means of terminating the distributorship. However, that clause provides certain protections to the distributor: (1) ninety days' notice, (2) the opportunity to cure, and (3) the ability to arbitrate. Coors opted at its peril for immediate termination. This decision deprived Maykuth of his contractual and statutory protections, and thus breached the agreement.

■ The district court, in considering the possible application of the minimum sixty-day notice provision of Mont.Rev. Code Ann. § 16-3-222(5), erroneously concluded that Maykuth had waived his right to notice. This was based in part on the fact that Maykuth had failed to seek an order enjoining the termination under Mont.Rev. Code Ann. § 16-3-225.[6] That statute does not specify that injunction is an exclusive remedy. Maykuth's failure to choose it thus could not limit his ability to seek other remedies. We will not infer waiver of important statutory and contractual rights without clearer statutory instruction.

The district court also based its waiver determination on testimony of Coors executives concerning a post-termination meeting held to determine the proper disposition of Maykuth's inventory and assets. Maykuth did not attend the meeting; his counsel and his banker did. Coors asked Maykuth's counsel "if they wanted to take the 60-days, according to the state law of Montana." Maykuth's counsel declined the offer.

■ Coors's belated attempt to give notice did not satisfy the statutory requirements that notice and an opportunity to cure be tendered prior to termination. It also did not comply with the notice, arbitration, and cure of deficiencies provisions of the contract. In a practical sense, "notice" that comes after employees are dismissed, customers are notified, and operations are terminated is of absolutely no value to the distributor. Coors's tender of notice was thus without legal or practical effect, and in declining it Maykuth waived none of his rights.

We reject Coors's assertion that if it did fail to give sufficient notice, this was a mere "technical defect," from which no damage could flow. Maykuth was not merely deprived of advance notice. Coors's failure to comply with the statute and ¶ IX(2) of the contract denied him the ability to challenge the termination through arbitration or to avoid it through cure of his deficiencies.

We therefore hold that Coors breached its contract with Maykuth and is liable for the damages that resulted from the termination of the distributorship. We remand to the district court for the limited purpose of determining appropriate damages.

### III

### COUNT THREE

Maykuth alleged that Coors engaged in resale price maintenance in violation of Sec-

---

**5.** The district court made no specific findings as to the basis for the termination; nor did it determine whether the bases asserted by Coors constituted just cause, as required by the state statutes. Our review of the record suggests that Maykuth raised serious questions as to how the territorial restriction and quality control provisions of the contract should be interpreted and applied. In view of our resolution of this issue, however, we need not determine if Maykuth breached the agreement.

**6.** Mont.Rev. Code Ann. § 16-3-225 provides:

Any court of competent jurisdiction may enjoin the cancellation or termination of a franchise or agreement between a wholesaler and a brewer at the instance of a wholesaler who is or would be adversely affected by the cancellation or termination. In granting an injunction, the court shall provide that the brewer shall not supply the customers or territory of the wholesaler who is servicing the territory or customers through other distributors or means while the injunction is in effect.

tion 1 of the Sherman Act, 15 U.S.C. § 1. The trial court granted Coors's motion to dismiss this count under Fed.R.Civ.P. 41(b), finding that Coors did not suggest specific pricing schedules, and that Maykuth was free to exercise independent judgment in setting prices. Maykuth contends the dismissal was error because he presented credible and sufficient evidence of a price fixing scheme.

■ A Rule 41(b) dismissal is an adjudication on the merits. The district court's resolution of the factual issues will not be overturned unless the findings are clearly erroneous. *Shah v. Mt. Zion Hospital & Medical Center,* 642 F.2d 268, 271 (9th Cir. 1981); *Rutledge v. Electrical Hose & Rubber Company,* 511 F.2d 668, 676 (9th Cir. 1975). Because ample evidence supports the district court's findings on this issue, the dismissal of this count was not error.

■ The written agreement between Maykuth and Coors neither set resale prices nor reserved to Coors the right to set them. Maykuth contends, however, that an implied agreement existed because Coors specified a pricing policy and coerced distributors to comply with it. The evidence showed that when Maykuth asked Coors executives for advice on pricing, he was told that the company's "philosophy" was that "Coors beer is a premium quality beer, and you should price it at premium prices." Maykuth rejected this philosophy, implementing his own program of promotional prices in an effort to increase sales. He testified that Coors did not threaten reprisals if he did not comply with company policy. He developed his own pricing programs, and implemented price promotions during a substantial portion of the business's operation. Testimony of another Coors distributor and of one of Maykuth's employees also indicated that each dealer set its prices independently. This evidence does not permit the inference that Coors imposed resale price maintenance on its distributors. We therefore affirm the dismissal of the price fixing claim.

## IV

### COUNT FOUR

The agreement appointed Maykuth as distributor "in the area set forth in the Market Description attached hereto." Maykuth claimed that this clause constituted a territorial restraint that violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Coors sought partial summary judgment on this count. It contended that because Mont. Rev. Code Ann. § 16–3–221 requires the brewer to designate exclusive marketing territories, Coors's inclusion of the territorial restriction in the contract was exempt from antitrust liability. It also argued that Maykuth had not suffered a competitive injury as a result of the contract provision, and thus could not state a claim under Section 1 of the Sherman Act.

■ The district court concluded that Coors was entitled to summary judgment because the state action exemption to the antitrust laws precluded liability. We must uphold correct legal conclusions even though they are reached for the wrong reason and must affirm a correct decision on any ground fairly supported by the record. *United States v. Washington,* 641 F.2d 1368, 1371 (9th Cir. 1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). Although we disagree that state action immunizes the territorial restriction complained of, we agree with the district court that Coors was entitled to judgment as a matter of law on this count.

■ Maykuth's specific challenge to the territorial restraint imposed by the contract was that it prevented him from making sales of beer for distribution out-of-state. Although the Montana regulatory scheme does place restrictions on in-state distribution, Montana does not purport to regulate distribution of beer outside the state. Because there is no clearly articulated and affirmatively expressed state policy to regulate such sales, Montana statutes could not shield the prohibition of out-of-state sales from the application of the antitrust laws. *California Retail Liquor Dealers v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct.

937, 943, 63 L.Ed.2d 233 (1980); *Turf Paradise, Inc. v. Arizona Downs,* 670 F.2d 813, 822 (9th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982). Since Maykuth's challenge addresses only the prohibition of out-of-state sales, we need not decide whether the Montana statute constitutes sufficient state action to exempt territorial restrictions within Montana from the federal antitrust laws.

■■■ We conclude, however, that summary judgment on this claim should have been granted on the alternate ground advanced by Coors. To establish his claim that Coors violated Section 1 of the Sherman Act, Maykuth was required to show a proximate causal connection between the territorial restraint and his economic injury. *William Inglis & Sons Baking Company v. ITT Continental Baking Company, Inc.,* 668 F.2d 1014, 1051 (9th Cir. 1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *Flintkote Company v. Lysfjord,* 246 F.2d 368, 392 (9th Cir.), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). His burden in response to Coors's motion for summary judgment on this ground was to "come forward and expose the existence of genuine issues for trial . . . ." *Castaneda v. Dura-Vent Corp.,* 648 F.2d 612, 617 (9th Cir. 1981).

■■■ Maykuth alleged that his termination resulted from his decision to sell to Super Save large quantities of beer for out-of-state distribution. The thrust of Maykuth's challenge was that there was an unlawful vertical restraint of trade that economically injured Maykuth. His specific complaint was that he could not sell beer in his territory which was destined for resale in Alabama. However, Alabama was a market in which Coors did not sell beer nor permit any of its distributors to sell beer; it limited its market to the Western States. Thus, since no seller of Coors beer sold in Alabama, there was no competitive injury suffered by Maykuth.

Our concern in assessing the market impact of vertical restrictions under the antitrust laws is the possible reduction of intrabrand competition. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 51–52, 97 S.Ct. 2549, 2558, 53 L.Ed.2d 568 (1977). In this case there was no reduction of competition among distributors because the Alabama market was not open to any distributor. Furthermore, there was no evidence presented in response to the motion for summary judgment, nor any allegation in the complaint, that Coors's limitation of its market to the Western States was a result of any unlawful horizontal conspiracy. Because the vertical territorial restriction in this case had no effect on intrabrand competition, and because there was no evidence of unlawful horizontal restraint of trade, we affirm this portion of the judgment.

V

COORS'S COUNTERCLAIM

■■■ Coors's counterclaim involved the 4,080 cases of beer sold by Maykuth to Super Save and intercepted in transit by Coors. It alleged that the sale to Super Save breached the distributorship agreement, and that Coors suffered a loss of $7,929.10 as a result of the breach. The district court concluded that Coors was damaged by Maykuth's "failure to comply with territorial limitation and quality control provisions" of the agreement. Coors was awarded damages in the requested amount.[7]

Coors intercepted the beer and claimed possession of it by means of a temporary restraining order issued by a state court in Colorado. Coors assumed that when it took the beer from Bennett's drivers, Bennett would withhold payment due Super Save.

---

7. Coors contended at oral argument that Maykuth had filed no answer in response to the counterclaim, and should not now be allowed to contest its claims. The district court docket sheet shows Maykuth did file a responsive pleading. At trial Coors assumed the obligation of producing evidence to support the counterclaim. It did not object to Maykuth's rebuttal of its claims; nor did it challenge Maykuth's ability to move under Fed.R.Civ.P. 41(b) to dismiss the counterclaim.

It therefore reimbursed Super Save for the $23,460.00 the store had paid Maykuth for the beer. Coors had determined this reimbursement was necessary "from a public relations standpoint." Coors then sold the beer to its subsidiary, Coors Distributing Company, for $15,530.90. The unrecovered purchase price, $7,929.10, was claimed as damages. Although the subsidiary later resold the 4,080 cases through regular distribution channels, amounts gained on resale were not subtracted from the damage claim.

Coors has failed to articulate to this court any legal basis for its repossession and resale of the beer. We assume Coors's theory attempts an analogy to the seller's right to resale under the Uniform Commercial Code. *See* U.C.C. § 2-706. Those statutory protections, however, rest on the assumption that the seller retains ownership of the goods because the buyer has breached the purchase contract. This case presents a different situation. Coors acknowledges that possession and ownership here had effectively passed from Coors to Maykuth, and from him to Super Save and then to Bennett. The fact that Coors regained physical possession of the beer and paid Super Save does not establish its legal right to damages from Maykuth for any loss on resale.

Coors failed to proffer any evidence of Maykuth's liability. Even if it is assumed that Maykuth's sale to Super Save breached the distributorship agreement, the causal relationship between the breach and the alleged damages remains unproved. Coors made no showing that it had a contractual right to repurchase and resell the beer at a loss or that such action was a foreseeable consequence of the breach. Coors admits that Maykuth no longer owned the beer, that Coors chose to acquire it from a third party, and that it negotiated the sale to its subsidiary at a loss for distribution through regular channels. There is no evidence of whether these sales ultimately resulted in a profit or a loss. Why this scheme creates a liability on Maykuth's part to make up Coors's claimed loss remains unexplained. This portion of the judgment is therefore reversed.

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED in part.