Joe MENDELOVITZ, d/b/a Eastex
Wholesale Beer,
Plaintiff-Appellant,

v.

ADOLPH COORS COMPANY and
Highland Coors Distributors, Inc.,
Defendants-Appellees.

No. 81–2006.

United States Court of Appeals,
Fifth Circuit.

Dec. 17, 1982.

John Fritz Barnett, Houston, Tex., for plaintiff-appellant.

Bradley, Campbell & Carney, Leo N. Bradley, Earle D. Bellamy, II, Golden, Colo., Vinson & Elkins, Ann Lents, John L. Murchison, Jr., Houston, Tex., for Adolph Coors Co.

Baker & Botts, Ronald L. Palmer, Neil Kenton Alexander, Jr., Houston, Tex., for Highland Coors Distributors, Inc.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

Joe Mendelovitz appeals the dismissal of this antitrust action against the Adolph Coors Company and Highland Coors Distributors, Inc., brought under section one of the Sherman Act, 15 U.S.C. § 1, and the Texas antitrust laws, Tex.Bus. & Com. Code Ann. § 15.01 et seq. (Vernon 1968). At the close of plaintiff's case below, the district court granted defendants' motions for directed verdict on all claims. Finding no error in the rulings of the district court, we affirm.

FACTS:

The Adolph Coors Company ("Coors") is the fifth largest beer manufacturer in the United States. Among the major domestic beer producers, Coors is unique because it operates only one brewery—located in Golden, Colorado—and because the authorized distribution of its beer is limited to fourteen western states.[1] Coors restricts the sale of its beer by defining in its contract with distributors the territory and quality control procedures which each distributor must respect. Coors distributors can and often do sell to local wholesalers, and when they do so their contractual obligations extend to the resales by wholesalers. This action arises as a result of refusals by Coors distributors to sell to a wholesaler because he failed to respect Coors' territorial and quality specifications.

The unique brewing process and strict quality control procedures of Coors are once again the subject of antitrust litigation.[2] According to Coors, the quality of the beer, once packaged, is negatively affected by three major factors: age, heat and light. To combat potential flavor deterioration from these elements Coors has developed specific quality control procedures. The effect of age is minimized by rotating the beer so that the oldest stock is sold first; exposure to light is reduced by the use of aluminum cans and brown glass bottles; and the effect of heat is lessened by refrigeration during both the storage and transportation of the beer.

The need to avoid exposing Coors beer to heat has produced a marketing scheme, developed in the early 1960's, known as refrigerated marketing. Under this scheme, the beer emerges from the production process at the plant in Golden at a temperature not exceeding forty degrees Fahrenheit. It is packaged, placed into refrigerated or insulated rail cars, and shipped directly to the distributor, who then assumes responsibility for the condition of the beer until it reaches the consumer.

Each of Coors' distributors is required to sign an identical written agreement with Coors specifying the territorial restrictions and the quality control procedures which must be followed to preserve the freshness of the beer.[3] Coors does not undertake to

1. In 1976, when the activities which are the subject of this litigation took place, authorized distribution of Coors beer was limited to fourteen states: Arizona, California, Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, Oklahoma, Utah, Wyoming, Washington and the western part of Texas. Between that time and the time of trial, November, 1980, Coors expanded authorized distribution into Iowa, Missouri, Kansas and certain markets in Wyoming. The Coors representative at trial indicated that the company had plans to enter western Tennessee, northern Louisiana and Mississippi during 1981.

2. The brewing process and quality control procedures have been analyzed by other courts in previous antitrust actions. See, e.g., Adolph Coors Co. v. A & S Wholesalers, Inc., 561 F.2d 807, 810–11 (10th Cir.1977); Copper Liquor, Inc. v. Adolph Coors Co., 506 F.2d 934, 936–38 (5th Cir.1975); Adolph Coors Co. v. F.T.C., 497 F.2d 1178, 1181–82 (10th Cir.1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

3. The quality control procedures specified by Coors in its Policy Manual, adherence to which is mandated by the distributorship agreement, are extremely specific and demanding. For ex-

exact any such agreement from wholesalers or retailers who sell its beer. Instead, each container of Coors beer is marked with the name of the distributor so that any violation of the quality control procedures, even if committed by a wholesaler or a retailer, can be traced to the responsible distributor. A distributor may be terminated if he fails to correct such a violation within ninety days after notification by Coors.

Plaintiff, Joe Mendelovitz, has been a wholesaler of beer in Houston since 1954 and has operated under the name of Eastex Wholesale Beer ("Eastex Wholesale") since 1956. He has no direct association with any brewery; instead, his purchases are primarily from authorized distributors. Mendelovitz began to receive shipments of Coors beer from defendant Highland Coors in 1976, when Coors expanded its sales into eastern Texas. At that time, Highland Coors was assigned one of five distributorships in the Houston-Harris County area. The sales of each distributor were restricted to designated territories, none of which overlapped. Highland Coors became the sole supplier of Coors to Mendelovitz, because Mendelovitz's wholesale operation is located in Highland Coor's distribution area.

After receiving delivery of Coors twice a week for several weeks, Eastex Wholesale made its first sale of Coors beer to a purchaser outside of Texas, and outside Coors' area of authorized distribution, on July 1, 1976.[4] Between that date and the date on which Highland Coors terminated his supply, July 15, 1976, Mendelovitz sold five truckloads of Coors beer to persons in Louisiana, Massachusetts, New York and Wash-

ington, D.C. Most, if not all, of these "export" sales violated the Coors quality control procedures.[5]

After having been terminated by Highland Coors for his export practice, Mendelovitz attempted to, but was unable to, obtain delivery from other Coors distributors. However, he did receive supplies of Coors beer from other wholesalers located in Houston and other cities in Texas. The bulk of these purchases were shipped to buyers outside the authorized distribution states. Mendelovitz continued exporting Coors until 1979, at which time no wholesaler would sell to him. By this time, Coors' distributors had succeeded in cutting off all shipments of Coors to Mendelovitz through a practice of terminating or "allocating" wholesalers who were discovered to have been supplying him.[6]

DISCUSSION:

Mendelovitz appeals the directed verdict dismissing both his federal and state antitrust claims, the district court's ruling on the collateral estoppel effect of a previous decision involving Coors, and several evidentiary matters.

The standard by which we review appeals from directed verdicts is well established, as articulated in this court's leading en banc decision:

the court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences

---

ample, trucks used for distribution "are to be equipped with either mechanical refrigeration or approved dry ice bunkers and blowers"; storage temperature must be maintained at a maximum of 40 degrees Fahrenheit; and display at the retail level must respect specific refrigeration standards.

4. The evidence shows that Mendelovitz was first informed that other wholesalers were profitably shipping Coors beer to areas where Coors had no authorized distributors by a Highland Coors truck driver. This employee of Highland Coors was acting independently, with the hope of raising Eastex Wholesale's total

sales volume and thereby raising his commission.

5. For instance, some of the beer was stored in an unrefrigerated metal warehouse prior to shipping, several times the beer was transported out of Texas in unrefrigerated and uninsulated trailers, and many of the retailers who purchased the beer were not told about the Coors handling procedures.

6. Allocation is a form of rationing which provides a wholesaler with supplies adequate to meet only the needs of his local customers, thereby precluding export trade.

point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc).

### A. The Territorial Restraint.

■ Mendelovitz's first claim attacks defendant's territorial restrictions which prohibited him from selling Coors outside the fourteen western states that then composed Coors' area of authorized distribution. First, we must determine whether these restrictions are horizontal or vertical. Only if they are horizontal will they be per se illegal, *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 58 n. 28, 97 S.Ct. 2549, 2561 n. 28, 53 L.Ed.2d 568 (1977); if vertical, they will be tested by the rule of reason, *id.* at 58–59, 97 S.Ct. at 2561–2562. We decide that these restrictions are vertical restraints. Both the territorial limitation specified in the Coors distributorship agreement and the Highland Coors policy proscribing extra-territorial sales by its wholesalers operated between parties at different levels of the market structure. Because they are vertical,[7] our analysis of the territorial restraints must proceed under the rule of reason.[8]

■ Under rule of reason analysis, the plaintiff must prove that the defendant's alleged conduct "had an anticompetitive effect in the relevant product and geographic markets." *Butane,* 651 F.2d at 295. Mendelovitz identifies the product market as beer and the geographic market as national, with a geographic submarket in the Houston-Harris County area. While the record reveals questionable proof in support of these market definitions, we assume, without deciding, their correctness.

■ We find plaintiff's proof of anticompetitive impact deficient. The primary concern of the antitrust laws is the promotion of interbrand competition, though in limited circumstances proof of a reduction in intrabrand competition may establish a violation. *Continental T.V.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19; *H & B Equipment,* 577 F.2d 239, 246 (5th Cir.1978). Here, Mendelovitz failed to produce substantial evidence of a negative impact on the interbrand or intrabrand competition in any relevant market.

■ Plaintiff takes the position that by prohibiting the sale of Coors in the thirty-six states outside Coors' area of distribution, Coors has adversely affected interbrand competition in the national market. However, the antitrust laws do not mandate that a producer serve all available markets. Such an interpretation, without more, would enable the courts to compel all manufacturers—no matter how regional or local—to undertake nationwide distribution.[9] Although the prohibition against

---

**7.** This court has stated that "when the manufacturer is the source [of an agreement between manufacturers and distributors], the conspiracy is vertical." *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1004 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). *See United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *Carlson Machine Tools, Inc. v. American Tool, Inc.,* 678 F.2d 1253, 1259 (5th Cir.1982); *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir.1981).

**8.** The *per se* illegality of price restrictions survived *Continental TV,* 433 U.S. at 51 n. 18, 97

S.Ct. at 2558 n. 18. Although Mendelovitz amended his complaint to allege that the defendants had entered into an agreement to "fix prices through among others, territorial restraints," no evidence was presented on this contention at trial. The issue remains viable on appeal only in the context of plaintiff's offensive collateral estoppel position, which we discuss and reject below.

**9.** In fact, we have already decided that "a seller has a unilateral right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself." *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1113 (5th Cir. 1979). In the present case, plaintiff made no

sales of Coors in much of the national market must have some de minimis effect on interbrand competition in that market, there was no showing that such a restraint on trade was unreasonable. *See Maykuth v. Adolph Coors Co.,* 690 F.2d 689, 696 (9th Cir.1982).

▪ In addition to an alleged anticompetitive interbrand effect in the national market, plaintiff asserts that Coors' restrictive practices, and the resulting elimination of Eastex Wholesale as a wholesaler in Coors beer, have an anticompetitive impact on intrabrand competition in the Houston-Harris County market. However, there is no evidence pointing to an effect on the price of Coors, or any other anticompetitive effect, resulting from defendants' conduct or plaintiff's termination. As it stands, plaintiff's blanket assertion of weakened intrabrand competition is insufficient to support the finding of an antitrust violation. *See Aladdin Oil,* 603 F.2d at 1116.

Not only is there a failure to prove an adverse impact on intrabrand competition for the sale of Coors in the Houston area market, there is no suggestion that Coors is insulated from interbrand competition in this same submarket.[10] Even if we could infer some measurable reduction in intrabrand competition from the elimination of plaintiff as a purveyor of Coors, we would not be able to conclude that there has been any resulting market impact. We would still be obliged to examine the effect of interbrand competition in that market because, as the Supreme Court recognized in *Continental T.V.,* interbrand competition "provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. *See*

*Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111, 113 (5th Cir.1979); *Red Diamond,* 637 F.2d at 1005–06.

In addition to deciding that there is not substantial evidence to support a finding of anticompetitive impact, we note that Mendelovitz did not challenge the reasonableness of the Coors policies prescribing restricted territories for its distributors and requiring strict adherence to quality control procedures. Coors has offered substantial justification for these policies. According to Coors, they are essential to the efficient functioning of its quality control procedures, the rationale of which—avoidance of the adverse effect of age, light and heat on the quality of the beer—has never been questioned by plaintiff.

▪ Reviewing the evidence in the light most favorable to plaintiff, we have little difficulty in agreeing with the district court's conclusion that "[t]here is no substantial evidence that any restraints arising out of the quality control obligations in the contracts between Coors and its distributors are unreasonable." We therefore affirm the directed verdict dismissing plaintiff's territorial restraint claim.

### B. *Concerted Refusal to Deal.*

Mendelovitz's second claim is that Coors and Highland Coors combined to boycott sales of Coors beer to him and that they induced or coerced other Houston-area distributors and wholesalers into similar refusals to deal.[11] He alleges that this concerted refusal to deal constitutes a per se violation of section one of the Sherman Act.

▪ Certain agreements and behavior are deemed to have such a pernicious effect on competition that they are conclusively presumed to be unreasonable restraints of

---

showing that Coors had the productive capacity to supply its beer on a national scale.

**10.** The record indicates that interbrand competition in beer is significant. Budweiser, Schlitz, Lone Star, Miller, Pearl, Falstaff and numerous import beers all compete in the Houston-area market.

**11.** The Adolph Coors Company is linked to the conspiracy by the obligations imposed by its

territorial and quality policies and by the actions of its sales representatives. Coors' sales representatives were expected to observe closely the wholesale and retail accounts in their area to assure compliance with Coors' quality control requirements. When a Coors' sales representative discovered a violation, the responsible distributor would be notified. The distributor in turn usually allocated the supplies of the wholesaler.

trade; they therefore are scrutinized under a per se rule of illegality. *Northern Pacific Ry. v. United States,* 356 U.S. 1, 3, 78 S.Ct. 514, 517, 2 L.Ed.2d 545, 549 (1958); *see Arizona v. Maricopa County Medical Society,* —— U.S. ——, ——, 102 S.Ct. 2466, 2474, 73 L.Ed.2d 48 (1982). Included within this category are several practices referred to as group boycotts, or concerted refusals to deal. *United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1365 (5th Cir.1980). One commentator has explained boycott law as prohibiting "concerted efforts by traders at one level to keep others out or inhibit their competitive efforts at that level by making it more difficult for them to find what traders at that level need, usually supplies or customers but sometimes access to transactions with other traders at the same level." L. Sullivan, Antitrust 229–30, 232 (1977).

This court has concluded that "resort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the restraint in question is a 'naked restraint of trade.'" *E.A. McQuade Tours v. Consolidated Air Tour Manual Committee,* 467 F.2d 178, 187 (5th Cir.1973). This statement was given further delineation by our decision in *Realty Multi-List.* There we stated that "purposefully exclusionary or coercive conduct is a strong indicator that the boycott is a naked restraint of trade." 629 F.2d at 1367. However, we acknowledged that in certain cases, including group boycotts,

> we must be cautious to determine whether conduct whose apparent purposes, standing alone, might warrant *per se* treatment are reasonably connected to an integration of productive activities or other efficiency-creating activity in such a manner as to require an inquiry into

the net competitive effect under the rule of reason. *Id.*

■ Against this background, we conclude that the refusals to deal do not fall within any of the per se illegal categories. Plaintiff has not produced substantial evidence of any exclusionary purpose behind the refusals to deal.[12] In addition, as we discussed in our analysis of the territorial restraints, plaintiff has not attacked Coors' justification for its policies.

First, in determining the purpose behind the refusal to deal, we note that the failure of the Coors distributors to sell to Eastex Wholesale was mandated by their contractual obligations with the Coors Company. Highland Coors terminated sales to Eastex Wholesale only after learning of its export trade; Highland Coors, or any Coors distributor servicing Eastex Wholesale, could have been held in violation of its contract with Coors had they not succeeded in terminating its unauthorized export trade. The refusals to deal by other Coors distributors were necessitated by an additional contractual obligation with Coors. Because Coors distributors are not permitted to sell outside of their assigned territories, and because Eastex Wholesale is located in the territory given to Highland Coors, no other Coors distributor could deal with him.

Second, the actions of the Houston-area Coors distributors in terminating or "allocating" wholesalers who supplied Eastex Wholesale similarly were motivated by their contractual obligations with Coors, and not by any exclusionary purpose. Although the evidence reveals that the distributors did allocate the supply of Coors beer to some wholesalers in direct response to previous sales to Eastex Wholesale, there is no support for the conclusion that the

---

**12.** We accept plaintiff's claim that the distributors and wholesalers compete for retail customers. However, we note that the extent of this competition is limited. Distributors and wholesalers occupy two different roles in the distribution chain. Customers look to distributors for low prices and a regular schedule of supply. Wholesalers are often preferred, despite higher prices, because (1) they offer several brands of beer and other supplies at one location; (2) they allow smaller operations to purchase supplies when funds are available, as opposed to accommodating distributor delivery schedules; and (3) they operate in the evenings and on weekends, when distributors are generally closed. These differences in the service provided reduce the degree of competition, and therefore reduce the likelihood of an exclusionary practice.

purpose of such behavior was to exclude Eastex Wholesale from the market in which they competed, the Houston-area. To preclude sales in territories where no Coors distributors competed simply does not support the finding of an exclusionary purpose.[13]

The failure to prove an exclusionary purpose defeats plaintiff's claim for the application of the per se rule. As this court stated in *Aladdin Oil:* "[the] requirement of illegitimate purpose or effect marks the distinction between concerted activity which is an innocent aspect of business and concerted activity which is inimical to competition." 603 F.2d at 1116.[14]

Analyzed under the rule of reason analysis, we adopt the same result reached in our analysis of the territorial restraints. Mendelovitz has failed to prove that the alleged refusal to deal has had an anticompetitive effect in any relevant market. We therefore affirm the directed verdict dismissing plaintiff's refusal to deal claim.

C. *Texas Antitrust Claims.*

■ Mendelovitz asserts that the district court erred by extending the directed verdict to include his pendent, Texas claim.[15] That claim is now defined as an objection to Coors' imposition and enforce-ment of exclusive territories for its Houston distributors, in violation of Texas state law.[16] Under Texas state law, agreements between manufacturer and distributor may not allocate exclusive territories. Plaintiff admits that Coors' distributorship agreements do not expressly confer exclusive territories, but he argues that Coors, by designating only one distributor per territory and by not allowing the distributors to sell outside of their assigned territories, has created de facto exclusive territories.[17]

■ We affirm the decision below dismissing the state law claims. Yet, we do so without deciding the question of the compatibility of Coors' distributorship arrangements with Texas state law. Instead, we affirm because the alleged exclusive distributorship arrangements are not the source of Mendelovitz's alleged injury. Antitrust suits under the Texas statutes are tort actions, see *Erickson v. Times Herald Printing Co.,* 271 S.W.2d 329, 332 (Tex.Civ. App.—Dallas 1954, writ ref'd n.r.e.), and Mendelovitz's claim is deficient for lack of a fundamental element of such actions, cause in fact.[18]

■ Mendelovitz complains of injury to his business resulting from Coors' policy of prohibiting the sale of its beer outside of a

---

**13.** Admittedly, an incidental effect of the refusal to deal with Eastex Wholesale was to preclude Eastex Wholesale's trade in the Houston area, where the participants in the refusal to deal did compete. However, the evidence shows that those who refused to deal with Eastex Wholesale did so solely with the purpose of preventing its export trade. In fact, six months after Highland Coors terminated Eastex Wholesale, the president of Highland Coors sent a letter to Mendelovitz offering to resume his supply for his customers in the Houston area.

**14.** The lack of any exclusionary purpose distinguishes this case from the two cases pointed to by appellant as controlling. *United States v. General Motors Corp.,* 384 U.S. 127, 129, 86 S.Ct. 1321, 1323, 16 L.Ed.2d 415 (1965); *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 209, 79 S.Ct. 705, 707, 3 L.Ed.2d 741 (1958).

**15.** As a preliminary matter, Mendelovitz asserts that his Texas antitrust claim was not included in the defendants' motions for directed verdict. A review of the transcript of the hearing on the motions, however, indicates sufficient discussion of the matter to warrant the district court's passing on the state law claim.

**16.** Texas Business and Commerce Code §§ 15.-01 *et seq.;* Texas Penal Code 667–26 (1976); and Texas Alcoholic Beverage Code §§ 102.51 and 102.52 (1977).

**17.** The Texas courts have expressed some willingness to look behind the distributorship agreement and to explore the true nature of the relationship between manufacturer and distributor. *See, e.g., Ford Motor Co. v. State,* 142 Tex. 5, 175 S.W.2d 230, 233 (1943).

**18.** The Texas antitrust laws do not contain a provision, similar to section four of the Clayton Act, 15 U.S.C. § 15, establishing a requirement of "injury," or any other requirement, as a prerequisite to a successful cause of action. Therefore, we utilize the fundamental standards applicable in common law tort actions.

fourteen-state area, and from his inability to receive Coors beer as a result of the alleged concerted refusal to deal. His claim challenges the territorial and quality restrictions Coors places on the sale of its product. However, this injury is in no way related to the alleged de facto exclusive distributorships to which Mendelovitz points as violations of state law. Even if Coors appointed multiple distributors in each territory, and thereby was in undisputed compliance with Texas state law, Mendelovitz would still be subjected to the injury complained of.

### D. Offensive Collateral Estoppel.

Mendelovitz urges this court to approve his attempted use of offensive collateral estoppel to bar Coors from denying that its territorial restraints are part of a vertical price-fixing scheme. He points to an earlier decision of this court, *Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934, 944–45 (5th Cir.1975), in which we found Coors' territorial restrictions to be ancillary to an illegal scheme of resale price maintenance. If we accept plaintiff's collateral estoppel claim, Coors' policies would be per se illegal.

■■■ However, we affirm the district court's rejection of this claim. Even if we accepted plaintiff's contention that Coors' current practices are identical to those determined illegal in *Copper Liquor,*[19] we would reject the use of collateral estoppel here because the relevant legal standard has been changed significantly since our decision in that case.

**19.** In support of its contentions that Coors' practices have not changed since *Copper Liquor,* plaintiff points to Coors' answer to an interrogatory which plaintiff interprets as stating that Coors has not changed its pricing policies since July, 1973. In interrogatory No. 2 of plaintiff's third set of interrogatories, we find that Mendelovitz has given more force to Coors' answer than is warranted. The Coors response could be construed to mean that the company has never fixed wholesale prices, or at least that it has never admitted to controlling such prices.

**20.** The same result was reached in this court in *Del Rio Distributing, Inc. v. Adolph Coors Co.,*

In *Copper Liquor,* Coors' procedures were held illegal under the per se rule announced in *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). However, the Supreme Court expressly reconsidered the *Schwinn* rule in *Continental TV,* 433 U.S. at 47, 97 S.Ct. at 2556. We believe this change in the legal standard precludes the collateral estoppel effect of our earlier decision. To impose this earlier decision on Coors would be to deny it a "full and fair opportunity to litigate" the allegation of vertical price fixing under the current legal standard.[20] See *Johnson v. United States,* 576 F.2d 606, 614 (5th Cir.1978), cert. denied, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981).

### E. Evidentiary Rulings.

Mendelovitz alleges error in two evidentiary rulings of the district court. First, he claims that the court wrongfully excluded the testimony of several wholesalers. Admission was sought under Rule 801(d)(2)(E), Federal Rules of Evidence, which permits the admission of hearsay statements made "by a coconspirator of a party during the cause and in furtherance of the conspiracy." The district court refused to admit the testimony because it found that the plaintiff failed to satisfy the test for the introduction of testimony by a coconspirator established in *United States v. James,* 590 F.2d 575, 581 (5th Cir.) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).[21]

589 F.2d 176 (5th Cir.), cert. denied, 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979).

**21.** *James* requires a showing of a conspiracy by substantial evidence independent of the coconspirator's statements. In addition to showing that a conspiracy existed, the independent evidence must show that the declarant and the defendant were members of the conspiracy, and that the statements were made during the course of and in furtherance of the conspiracy. *Id.* at 578. Although *James* involved the prosecution of a criminal conspiracy, we have held it to apply in civil actions. *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1121 (5th Cir.1980).

The excluded testimony consists of the statements of two wholesalers that representatives of Coors distributors told them that they were being terminated or placed on allocation for selling beer to Eastex Wholesale, and a third statement by another wholesaler that he was told by one Coors distributor "to get a letter from [the president of Highland Coors]" approving the sale of beer to him because he was located in Highland Coors' territory.

■ Assuming their admissibility, these statements, either singularly or cumulatively, would not alter the outcome we reach today. We therefore affirm the trial court's judgment without deciding the correctness of its application of the *James* test. The evidence contained in these statements shows only conditions which are admitted to by defendants. They do not add to plaintiff's proof of anticompetitive impact and, therefore, they cannot resurrect his claim that the territorial restrictions were unreasonable. They also do not prove that Coors or any of its Houston-area distributors had any exclusionary purpose in their refusal to deal.

■ Mendelovitz also objects to the admission into evidence of a letter from the president of Highland Coors to Mendelovitz offering to resume the supply of Coors beer for sale to his traditional, local customers. The proposal was conditioned on Mendelovitz agreeing to refrain from making sales "to persons or entities you have reason to believe will not maintain proper quality control." The final paragraph of this letter suggested that Mendelovitz respond through his attorney, since litigation was in progress. Mendelovitz maintains that this letter constituted a settlement offer and, as such, was inadmissible under Fed.R.Evid. 408.[22]

We reject this argument. The letter was not a part of settlement negotiations ·and, on its face, does not offer to compromise or settle any claim in this action. Because Highland Coors offered to resume shipments of Coors beers for sale only to local customers of Eastex Wholesale, the letter does not compromise Mendelovitz's claim that Coors' policy of limiting distribution to fourteen western states was unreasonable. Similarly, the offer does not diminish Mendelovitz's group boycott claim. Neither Coors nor its distributors have denied that they allocated supplies of Coors beer to all wholesalers who permitted Coors beer to be sold outside their territories. Because this letter was not the subject of settlement negotiations, the objection to admission under Rule 408 was properly dismissed.[23]

The decision of the district court is, in all respects,

AFFIRMED.

---

**22.** Fed.R.Evid. 408 provides, in relevant part: "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount."
*See, Ramada Dev. Co. v. Rauch,* 644 F.2d 1097, 1107 (5th Cir.1981).

**23.** We will overturn evidentiary rulings under Rule 408 only if the trial judge has abused his discretion. *Ramada,* 644 F.2d at 1108.