719 F.2d 873
 Henry HERSCH, et al., Plaintiffs-Appellants,
v.
UNITED STATES of America and Rockwell International
Corporation, Defendants- Appellees.
INSURANCE CO. OF NORTH AMERICA, Plaintiff-Appellant,
v.
UNITED STATES of America and Rockwell International
Corporation, Defendants- Appellees.
 Nos. 81-3544, 81-3545.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 5, 1983.
Decided Oct. 20, 1983.
 
 Ralph F. Mitchell, Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, Daniel C. Cathcart, argued, Magana, Cathcart, McCarthy & Pierry, Los Angeles, Cal., for plaintiffs-appellants.
 James Q. Doran, Cincinnati, Ohio, Christopher K. Barnes, Asst. U.S. Atty., Nicholas J. Pantel, Cincinnati, Ohio, Barbara O'Malley, argued, Civ. Div., Torts Branch, U.S. Dept. of Justice, Washington, D.C., Michael R. Gallagher, Alton Stephens, argued, Gallagher, Sharp, Fulton, Norman & Mollison, Cleveland, Ohio, for defendants-appellees.
 Before KEITH and KRUPANSKY, Circuit Judges, and HORTON, District Judge.*
 KRUPANSKY, Circuit Judge.
 
 
 1
 These are consolidated appeals from three cases tried together in the United States District Court for the Southern District of Ohio. Following presentation of the plaintiffs' case, the lower court granted an involuntary dismissal in favor of defendant United States and also a directed verdict in favor of defendant Rockwell International Corporation (Rockwell).
 
 
 2
 These actions arise out of the crash of a private airplane on February 5, 1974, approximately two miles west of the town of Cynthiana, Kentucky. The catastrophe claimed the lives of the pilot and two passengers.
 
 
 3
 The record discloses that on the morning of the accident, an Aerocommander Model 680-FP (Aerocommander), piloted by Eugene Nicholas Halmi, Jr., departed from Lunken Airport in Cincinnati, Ohio at 7:44 a.m., en route to Fort Lauderdale, Florida. The Aerocommander proceeded generally south towards Lexington, Kentucky at an altitude of 15,000 feet. At the same time, a Boeing 727 jet airliner, Delta Flight 330 (Delta 330), was proceeding north en route to the Greater Cincinnati Airport. Delta 330 was flying at an altitude of 18,500 feet on a "jet route" referred to a "J-43." A jet route is eight nautical miles wide and, unless specifically authorized to deviate, pilots are required to fly the center of these air corridors. 14 C.F.R. Sec. 91.123 (1983).
 
 
 4
 During the pertinent time period, both aircraft were communicating with air traffic controller Frederick Peter Feigert (Feigert), at the Indianapolis Control Center. Feigert testified that it was necessary, for reasons neither disputed nor relevant in this case, to direct Delta 330 to descend to an altitude of 10,000 feet. Feigert also testified, and it is undisputed, that controllers' manuals require a controller to maintain a horizontal separation between aircraft of five nautical miles, or, if aircraft are within five nautical miles of each other, to maintain a vertical separation of 1,000 feet.
 
 
 5
 Because Delta 330 would be descending to 10,000 feet, Feigert testified that it was necessary to insure horizontal separation between the two aircraft. Accordingly, at 7:58:45 a.m., he directed the Aerocommander to turn 20? west. Approximately 40 seconds later Feigert directed Delta 330 to turn 15? east.[1]
 
 
 6
 At 7:59:37, 29 seconds after instructing Delta 330 to turn, Feigert ordered it to commence its descent to 10,000 feet. At 8:01:10 a.m. Feigert cleared the Aerocommander's request to proceed to an altitude of 17,000 feet. Five seconds later the Aerocommander reported that it was climbing to 17,000 feet as authorized by Feigert. This was the last voice contact with the Aerocommander.
 
 
 7
 The Aerocommander crashed at approximately 8:05 a.m. As indicated, the plane crashed two miles west of Cynthiana, Kentucky, on the ground track of jet route J-43.
 
 
 8
 In 1975, the representatives of the estates of the pilot and both passengers instituted two separate civil actions. In one action, the representatives purported to state a claim for relief under the Federal Tort Claims Act, 28 U.S.C. Secs. 1346(b), et seq. The theory of that action, as developed by circumstantial evidence, was predicated upon the alleged negligence of air traffic controller Feigert in failing to maintain a safe separation between the Aerocommander and the Delta 330 thereby proximately causing the Aerocommander to encounter the "wing tip vortices" (sometimes referred to as wake turbulence) of the Delta 330.[2] This encounter, according to plaintiffs' theory, caused the Aerocommander to roll and enter into a spin resulting in the crash.
 
 
 9
 The other action initiated by the legal representatives named, as defendant, Rockwell, the company that designed and manufactured the Aerocommander. Jurisdiction in this second action was founded on diversity of citizenship. The thrust of the action was product liability, charging that a design defect in the Aerocommander limited its ability to recover from a spin.
 
 
 10
 Following the filing of the above complaints, the Insurance Company of North America filed a subrogation action against both the United States and Rockwell, essentially restating the allegations incorporated in the initial actions.[3]
 
 
 11
 The three actions were consolidated for trial in the Southern District of Ohio. The Federal Tort Claim was tried to the judge sitting as a finder of fact, while a jury was seated to hear the diversity action against Rockwell.
 
 
 12
 Plaintiffs presented evidence in their case in chief for 14 days following which the United States moved for involuntary dismissal and Rockwell moved for a directed verdict. The trial court issued oral findings of fact and conclusions of law granting the motion of the United States and took Rockwell's motion under advisement. Subsequently, the trial court issued a written opinion granting Rockwell's motion for a directed verdict thereby disposing of the matter in its entirety. These appeals ensued and were consolidated.
 
 
 13
 As indicated, the district judge was acting as trier of fact in the Tort Claim lodged against the United States while a jury was seated to find the facts in the action against Rockwell. At the close of the plaintiffs' case the United States advanced, and was granted, a motion for involuntary dismissal under Rule 41(b), Fed.R.Civ.P. Rockwell's motion for a directed verdict, however, was made, and granted, pursuant to Rule 50(a), Fed.R.Civ.P. The distinction is crucial for "[a]lthough [Rule 41(b) ] somewhat fulfills for a nonjury case the function of a motion for a directed verdict in a jury case, the standard by which the court passes on the two kinds of motions is very different...." 9 C. Wright and A. Miller, Federal Practice and Procedure Sec. 2371 (1971).
 
 Rule 41(b), provides, in pertinent part:
 
 14
 After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).
 
 
 15
 As the Rule indicates, "[w]hen the defendant makes a Rule 41(b) motion to dismiss for insufficiency of the plaintiff's evidence it becomes the duty of the court to weigh and evaluate the evidence." Weissinger v. United States, 423 F.2d 795, 798 (5th Cir.1970). Moreover, in evaluating the evidence, the judge makes no special inferences in favor of the plaintiff. Emerson Electric Co. v. Farmer, 427 F.2d 1082, 1086 (5th Cir.1970).
 
 
 16
 A motion for a directed verdict under Rule 50(a), of course, invokes a very different standard. The trial judge does not weigh the evidence. Rather, the judge views the evidence, and inferences therefrom in the light most favorable to the nonmoving party. Grim v. Leinart, 705 F.2d 179, 181 (6th Cir.1983); Rockwell International Corp. v. Regional Emergency Medical Services of Northwest Ohio, Inc., 688 F.2d 29, 31 (6th Cir.1982); Milstead v. International Brotherhood of Teamsters Local 957, 580 F.2d 232, 235 (6th Cir.1978), cert. denied, 454 U.S. 896, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981). The trial court may only grant the directed verdict "if there is a complete absence of pleading or proof on an issue or issues material to the cause of action or where there are no controverted issues of fact upon which reasonable men could differ." Rockwell International Corp., supra at 31.
 
 
 17
 Furthermore, on appeal, the standards this Court must apply to review involuntary dismissals and directed verdicts are markedly different. Upon review from the grant of a directed verdict, the appellate court must apply the same standard, set forth above, as the district court. Milstead v. International Brotherhood of Teamsters, supra at 235; O'Neil v. Kiledjian, 511 F.2d 511 (6th Cir.1975). In reviewing a Rule 41(b), dismissal in which the lower court has made findings of fact, however, the standard is the same as that for reviewing findings of fact by a court following a full trial. Simpson v. United States, 454 F.2d 691, 692 (6th Cir.1972). That is, the appellate court may not disturb the lower court's conclusion unless clearly erroneous. See, e.g., Maykuth v. Adolph Coors Co., 690 F.2d 689, 695 (9th Cir.1982); Reimer v. Smith, 663 F.2d 1316, 1321 (5th Cir.1981).
 
 
 18
 In the action against the United States the district court concluded, as a matter of fact, that the Aerocommander and Delta 330 were never close enough to cause the smaller aircraft to roll and/or spin. The trial court supported this conclusion by reference to the evidence of record.
 
 
 19
 First, the trial court "was impressed with and believe[d]" the testimony of air traffic controller Feigert. The trial court observed that Feigert "testified at great length and withstood withering cross-examination." Feigert emphatically and unequivocally testified that he had maintained lateral separation between the Aerocommander and Delta 330.
 
 
 20
 Secondly, the trial court concluded that Delta 330 was flying very near to the center of jet route J-43 prior to executing its instructions to turn to the east. Accordingly, Delta 330 would have been too far east of the estimated "upset point" of the Aerocommander to induce the uncontrollable roll and spin theorized by the appellants.[4]
 
 
 21
 Appellants contend that the finding that Delta 330 was flying jet route J-43 at approximately its center is erroneous. Appellants rely on the testimony of one of their experts who asserted that, because of the limited accuracy of navigational equipment, it is difficult to fly the center line of a designated route. This expert also acknowledged, however, that Delta 330 could have been flying to the east of the center of jet route J-43, thereby positioning it even further from the approximate point where the Aerocommander experienced its fatal mishap. Moreover, appellants' second expert testified that a commercial pilot would not have difficulty flying and maintaining the center line of a designated air route.
 
 
 22
 Given the foregoing evidence, this Court concludes that the lower court's finding that Delta 330 was flying the center line of jet route J-43 immediately prior to executing the 16? turn east is not clearly erroneous. This finding totally refutes plaintiffs' wake turbulence encounter theory inasmuch as the easterly turn placed the Delta on a heading that carried it well beyond any dangerous proximity to the Aerocommander.
 
 
 23
 Plaintiffs contend however that three "call-outs" by air traffic controller Feigert actually supported a conclusion that the aircraft were on a converging course. The three controversial call-outs were as follows:
 
 
 24
 7:59:37: To Delta 330 "You've got traffic (The Aerocommander) at 11:00 [o'clock] and 20 miles southbound."
 
 
 25
 8:00:07: To Delta 330 "Your traffic's now 11:00 [o'clock] and 15 miles southbound."
 
 
 26
 8:00:22: To Aerocommander "Traffic (the Delta 330) at 11:00 [o'clock] and 12 miles northbound."
 
 
 27
 Plaintiffs' expert testified that these three call-outs fixed the aircraft on a converging course because the relative bearing (11:00) did not change. The expert estimated a converging speed of 640 knots by calculating the time between the 20 mile call-out and the 12 mile call-out--45 seconds. Because 640 knots is approximately the combined rate of speed of the two aircraft, the expert concluded that the planes were nearly in a head-on course. At this rate, according to the expert, the planes would have converged at approximately one minute and seven seconds after the 12 mile call-out. Another expert for the plaintiffs, employing the same method, reached the same conclusion.
 
 
 28
 The 11:00 references in the call-outs are standard aeronautical jargon utilized to position aircraft by reference to the face of a clock. Both of plaintiffs' experts acknowledged that these clock references are merely approximations employed to "get the pilot looking out the window" to visually sight the air traffic in the area. Furthermore, Delta 330 was turning 16? to the east when these call-outs took place. The plaintiffs' experts could only dismiss the turn as "ineffective" to keep the aircraft separate. Because of these inconsistencies in the experts' hypothesis and the conflicts with the testimony of Feigert that he had maintained separation of the aircraft, the district court rejected the experts' conclusions. This Court does not find the lower court's action clearly erroneous.
 
 
 29
 The plaintiffs also assert that the trial judge's findings are tainted because he plotted the courses of the two aircraft relying, in part, on his "background in the military" and having done "a little sailing." We disagree. It is true that a trial judge may not "deliberately set about gathering facts outside the record of a bench trial over which he [presides]". Price Bros. Co. v. Philadelphia Gear Corp., 629 F.2d 444, 447 (6th Cir.1980). Moreover, it is error for a trial court, sitting as a trier of fact, to "interject its personal evidentiary observations." Chart House, Inc. v. Bornstein, 636 F.2d 9, 11 n. 4 (1980). The trial judge, however, like a juror, is permitted to bring his experience and knowledge to bear in assessing the evidence submitted at trial. The trial judge did not overstep the bounds of propriety in this case.
 
 
 30
 In sum, the Court concludes that the lower court's finding that Delta 330 and the Aerocommander were not in close enough proximity for the wing tip vortices of the former to play a role in the crash of the latter is not clearly erroneous. Accordingly, the involuntary dismissal of plaintiffs' action against the United States will be affirmed.
 
 
 31
 In granting the directed verdict in favor of Rockwell the lower court concluded that plaintiffs had failed to present evidence of a design defect and failed to present evidence that the design of the aircraft proximately caused the crash.
 
 
 32
 The Court would observe initially that it was undisputed that Kentucky law governed the diversity action against Rockwell. Accordingly, the Kentucky standard for sufficiency of the evidence to withstand a directed verdict controls. Garrison v. Webb, 583 F.2d 258, 261 n. 4 (6th Cir.1978). Under Kentucky law, the burden was on plaintiffs "to show that the circumstances surrounding the accident were such as to justify a reasonable inference of probability rather than a mere possibility that the [alleged design defects] were responsible." Perkins v. Trailco Mfg. and Sales Co., 613 S.W.2d 855, 857-858 (Ky.1981).
 
 
 33
 The Court has thoroughly reviewed the evidence adduced by plaintiffs in the case at bar and is constrained to conclude that plaintiffs were unable to tilt the scales from "possibility" to "probability" on the causation issue.[5] The Court is aware of the difficulty of establishing causation in this type of disaster where eyewitness testimony is unavailable and much of the physical evidence is damaged or destroyed. Nevertheless, a jury should not be permitted to engage in speculation and conjecture. The trial court was correct in granting a directed verdict for defendant Rockwell.
 
 
 34
 In accordance with the foregoing the judgments in favor of defendants United States and Rockwell are hereby AFFIRMED.
 
 
 
 *
 The Honorable Odell Horton, United States District Judge for the Western District of Tennessee, sitting by designation
 
 
 [1]
 It was stipulated that the Delta 330 actually turned 16? east
 
 
 [2]
 These vortices are created by aircraft in flight and result from the differential in pressure over the wing surfaces. Small aircraft encountering these vortices can be thrown out of control. See Dickens v. United States, 545 F.2d 886, 890-91 (5th Cir.1977)
 
 
 [3]
 For purposes of clarity, plaintiffs in all three actions will hereinafter collectively be referred to as plaintiffs or appellants
 
 
 [4]
 Testimony at trial indicated that the Delta aircraft, flying at 15,000-17,000 feet, would produce a wake approximately 220 feet wide, 14 miles long and 50 feet deep. The wake would last for two minutes and, because of the wind on the date of the crash, would descend east-southeast at approximately 56 knots per hour. Testimony also indicated that the Aerocommander would have had to be within forty feet of the wake created by the Delta 330 to be affected significantly
 
 
 [5]
 Because of the resolution of the causation issue, it is unnecessary to consider whether plaintiffs adduced sufficient evidence of a defect in the design