812 F.2d 1406
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Richard L. BOOTH, Plaintiff-Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORP., Defendant, and Third Party
Plaintiff-Appellee,
Esther F. Booth, Third Party Defendant-Appellant.
 No. 86-5054.
 United States Court of Appeals, Sixth Circuit.
 Jan. 13, 1987.
 
 Before ENGEL, KRUPANSKY and NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff Richard Booth and third-party defendant Esther Booth, his wife, appeal from a magistrate's order dismissing Mr. Booth's claim against the Federal Deposit Insurance Corporation on an alleged oral agreement for forebearance in the collection of debts evidenced by certain promissory notes. The order appealed from also granted judgment in favor of the FDIC on its counterclaim and third-party claim on the notes. The record amply supports the magistrate's determination that the notes were immediately enforceable, no binding oral agreement to the contrary ever having been reached, and the magistrate's order will therefore be affirmed.
 
 
 2
 In 1981 and 1982, in connection with Mr. Booth's business as a construction contractor, Mr. and Mrs. Booth gave the United American Bank three demand notes totaling $750,000. In 1983 Mr. Booth gave the City and County Bank a demand note in the amount of $100,000. The interest rate on all four notes was 1% above the prime rate. The notes were acquired by the FDIC when it took over a failed bank that was the successor to the two payee banks. The FDIC demanded immediate payment, but Mr. and Mrs. Booth maintain that subsequent oral negotiations with the FDIC had culminated in a binding "workout agreement" allowing deferral of payment.
 
 
 3
 The negotiations were conducted initially between Mr. Booth and a Mr. Barrickman of the FDIC. In November of 1983 Booth gave Barrickman a written proposal to retire the notes. The proposal concluded, "[s]hould you find these terms agreeable, please prepare the necessary papers and notify us of your decision. Upon signing of the necessary documents, interest through September 30, 1983, shall be remitted." The workout plan was not acceptable to the FDIC, because the agency considered the proposed interest rate (11 1/2%) too low. No agreement having been reached, Booth did not pay the accrued interest.
 
 
 4
 Negotiations continued into the spring of 1984, with Mr. Charles Meade replacing Mr. Barrickman at the FDIC. While he was working on a project in Florida, Mr. Booth received a phone call from Mr. Meade stating that FDIC approval had been given for a workout agreement with a 13 3/4% interest rate. Some of the details of this projected agreement were provided by the testimony of Al Childress, Controller of Booth Construction Company, who also received a call from Meade in the spring of 1984. According to Mr. Childress, the demand notes were to be paid over a five year period, with no payments of principal to be made for the first twenty-four months and with the portion of the principal that would normally be paid during the first two years of a five year amortization period being paid in a lump sum at the end of twenty-four months. Interest on the unpaid balance would be paid at the rate of 13 3/4% throughout the five year period, but if Mr. Booth's income proved insufficient, even the interest payments could be deferred until the end of the two year period. When the agreement was reduced to writing and signed by the parties, finally, the interest due as of the spring of 1984 would be paid.
 
 
 5
 Mr. Childress testified that the FDIC was to receive no additional collateral, but Mr. Booth testified that a $1.5 million dollar promissory note would be given as additional collateral if a certain $157,000 debt were first satisfied. Mr. Booth also testified that principal payments would be made in the first twenty-four months if "we could do it," and he said interest could be delayed even beyond twenty-four months if his income were still inadequate.
 
 
 6
 Thomas McCarley, a surety bond underwriter, called Mr. Meade on May 9, 1984, to confirm the existence of a workout agreement. McCarley's understanding of the status of negotiations at that point was that for the next two years Mr. Booth would only be required to pay interest in quarterly installments. Booth and Childress had indicated to McCarley that an attempt would be made to reduce the principal indebtedness by approximately $300,000 to $350,000. McCarley further understood that if Booth honored the agreement, the FDIC would be willing to delay any further payment of principal even beyond the twenty-four month period. McCarley was under the impression in May of 1984 that the agreement would shortly be reduced to writing, but he never received any signed final document. In the fall of 1984, the absence of a written agreement prompted McCarley to request information from Booth as to the status of his obligation to the FDIC.
 
 
 7
 A meeting between the parties occurred in Knoxville in June of 1984. Although Mr. Booth maintained that the purpose of the meeting was to execute documents memorializing the prior oral understanding, no such documents were presented by the FDIC and questions arose at the meeting regarding the property securing the demand notes. Mr. Booth stood ready to pay the accrued interest when a workout agreement was signed, but he refused to do so in the absence of a signed agreement.
 
 
 8
 Subsequent to the Knoxville meeting Mr. Booth contacted various banks in an effort to borrow funds with which to retire the notes in full. Unsuccessful in that effort, he filed his complaint in federal district court on October 15, 1984, praying for enforcement of the supposed oral agreement. The FDIC responded with a counterclaim on the notes, joining Mrs. Booth as a third-party defendant. By agreement of the parties the suit was heard by a United States Magistrate pursuant to 28 U.S.C. Sec. 636(c).
 
 
 9
 The magistrate dismissed plaintiff's suit under Rule 41(b), Fed.R.Civ.P., at the end of plaintiff's proofs. When making a Rule 41(b) determination, "it becomes the duty of the court to weigh and evaluate the evidence.... [and] the judge makes no special inferences in favor of the plaintiff." Hersch v. United States, 719 F.2d 873, 876 (6th Cir.1983). This court's standard of review for findings of fact supporting a Rule 41(b) dismissal "is the same as that for reviewing findings of fact by a court following a full trial. (citation omitted). That is, the appellate court may not disturb the lower court's conclusion unless clearly erroneous." Id. at 877.
 
 
 10
 The magistrate found that "the parties to the purported workout agreement never intended to be contractually bound until such time as there was a final, integrated written contract that all parties were willing to sign." The "question whether the parties intended a contract is a factual one, not a legal one, and, except in the clearest cases, the question is for the finder of fact to resolve." Arnold Palmer Golf Co. v. Fuqua Industries, Inc., 541 F.2d 584, 588 (6th Cir.1976). We have no basis for upsetting the magistrate's determination as to the parties' intent here.
 
 
 11
 Mr. Booth's own conduct supports the conclusion that the parties did not intend to be legally bound until a final written agreement had been signed. Booth exploited what bargaining power is available to a debtor by insisting that a written workout agreement be signed before he paid any accrued interest. By the summer of 1984 the accrued interest exceeded $120,000. Mr. Booth's position is that a binding oral agreement had been reached prior to the June 1984 meeting in Knoxville, but his testimony regarding that meeting properly led the magistrate to the opposite conclusion. By Mr. Booth's own account, the purpose of the meeting was to execute the final documents and to pay the accrued interest. On cross examination, Booth stated that it would not have been "good business practice" to pay the accrued interest prior to the signing of the documents, and of course no documents were signed. Booth repeatedly testified that he had no intention of upholding his end of the claimed bargain until its terms were reduced to writing. Childress' understanding too was that Booth would only pay the interest after the documents had been signed.
 
 
 12
 Mr. Booth's actions subsequent to the Knoxville meeting also belie any notion that a binding agreement had been reached. Instead of demanding enforcement of the alleged oral agreement, Booth applied at several banks for a loan that would completely satisfy his debt to the FDIC. He also offered to apply proceeds from the "Dartmouth Willow Terrace Project" to his FDIC debt in exchange for additional time for total repayment. The magistrate correctly noted that such conduct was inconsistent with the assertion that a binding contract was in existence.
 
 
 13
 Oral negotiations may fail to create a binding contract for lack of "mutual assent to the terms of the agreement ..." Price v. Mercury Supply Co., 682 S.W.2d 924, 933 (Tenn.App.1984). The testimony of McCarley, offered on plaintiff's behalf, does confirm that as of early May, 1984, the parties had agreed on some of the terms of a workout plan. The agreed terms, however, were but a skeleton of a complete workout accord. The need for (and absence of) mutual assent to all material terms is confirmed by plaintiff's continued refusal throughout 1984 to pay any amount on the notes in the absence of a written workout agreement.
 
 
 14
 The magistrate's determination as to the non-existence of a binding contract is dispositive, and we need not reach the remaining issues advanced on appeal. AFFIRMED.