915 F.2d 1572
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Diane NELMS, Plaintiff-Appellant,
v.
MONTGOMERY COUNTY COMBINED HEALTH DISTRICT, Richard A.
Parsells, and Melanie Cutlip, Defendants-Appellees.
 No. 90-3006.
 United States Court of Appeals, Sixth Circuit.
 Oct. 12, 1990.
 
 Before KEITH and RALPH B. GUY, Jr., Circuit Judges, and LIVELY, Senior Circuit Judge.
 RALPH B. GUY, JR., Circuit Judge.
 
 
 1
 In this case involving allegations of racial discrimination, harassment, and retaliation, plaintiff Diane Nelms asserted claims against the Montgomery County Combined Health District (Health District), Health District Director Richard A. Parsells, and supervisor Melanie Cutlip under Title VII, 42 U.S.C. Sec. 2000e et seq., and 42 U.S.C. Secs. 1981, 1983, 1985(3), and 1986. By consent of the parties, a United States magistrate conducted a bench trial addressing all of the plaintiff's claims.[1] At the conclusion of the plaintiff's case, the magistrate dismissed the plaintiff's 42 U.S.C. Sec. 1981 claim and her procedural due process claim under section 1983 in accordance with Federal Rule of Civil Procedure 41(b). At the close of all evidence, the magistrate entered Rule 52(a) findings of fact and conclusions of law determining that the plaintiff had failed to substantiate her section 1983 equal protection claim, her discrimination, harassment, and retaliation claims under Title VII, and her conspiracy claims under 42 U.S.C. Secs. 1985(3) and 1986. We affirm.
 
 I.
 
 2
 Plaintiff Nelms, a black woman with training and experience in secretarial work, initially applied for a Clerk I position with the Health District in December of 1984. Although she was not hired at that time, she was contacted in March of 1985 in connection with an opening as an "Administrative Typist I" in the residential care facilities program run by the Health District. The plaintiff accepted the position and began working for the program on March 18, 1985. Upon completing a six-month probationary term, she became a full-time employee. The plaintiff's work during her first six months was evaluated as "highly satisfactory." In her first annual evaluation, which occurred in February of 1986, the plaintiff received a generally favorable rating, but her dependability score dropped significantly due to "excessive" use of sick leave.
 
 
 3
 When the plaintiff underwent her second annual evaluation in February of 1987, the residential care facilities program was nearly completed. The plaintiff received another generally positive rating, but her dependability score dropped to "poor" because of serious problems with tardiness and the use of sick time. Nevertheless, her supervisor in the residential care program recommended that she receive consideration "for any position for which she is qualified" upon conclusion of the program. The plaintiff subsequently applied for a transfer to the Community Health Services Division of the Health District. In response to the plaintiff's transfer request, defendant Melanie Cutlip interviewed the plaintiff and a white applicant, and defendant Richard Parsells ultimately chose the plaintiff to fill an "Administrative Typist I" position under Cutlip's supervision. Prior to the plaintiff's transfer, Cutlip told her colleagues that she was "excited" about the plaintiff's arrival because she "felt [the plaintiff] was a good secretary" and the division "need[ed] some extra help." (App. at 229-30).
 
 
 4
 Soon after she began her new job in March of 1987, the plaintiff and defendant Cutlip encountered problems working with one another. Among the sources of conflict were the plaintiff's possession of a radio in her office, the time at which the plaintiff arrived at work, and the plaintiff's desire to keep her office door closed. Tension between the two increased to the point that the plaintiff sent Parsells a memorandum on June 8, 1987, accusing Cutlip of harassment with regard to office conduct, tardiness, and appearance. The memo, however, made no mention of race-based harassment. Parsells responded to the memo by scheduling a meeting with Cutlip and the plaintiff on June 10, 1987.
 
 
 5
 At the June 10 meeting, Parsells discussed the issues of tardiness, work assignments, and office door policy with the plaintiff and Cutlip. Parsells proposed solutions to the various problems that existed between the plaintiff and Cutlip--arrival after 8:05 a.m. would be considered tardiness, work should be distributed evenly, and the plaintiff's office door generally should remain open because the office was a reception area. Parsells further implored the plaintiff and Cutlip to be sensitive to one another's concerns.
 
 
 6
 Parsells conducted a follow-up meeting with the plaintiff and Cutlip on July 29, 1987, "to see how things were going." Parsells had received memos from the plaintiff and Cutlip indicating that several confrontations between the two had occurred since the June 10 meeting, and he wanted to ascertain whether the working relationship between the two women could be salvaged. Parsells listened to the competing allegations, which did not involve any charges of racial slurs or derogatory comments, and then informed both women that he would make written findings in a week. He instructed both of them to control their outbursts in the interim. The plaintiff testified that, when she and Parsells were alone at the conclusion of the meeting, Parsells called her a "nigger" and asked her "who in the hell will respect your black ass?" (App. at 196). Parsells vehemently denied making any such comment. (App. at 257).
 
 
 7
 One day after her second meeting with Parsells and Cutlip, the plaintiff sent a brief memorandum to Parsells indicating that "I feel that I am being discriminated against and therefore, I will be requesting a meeting of the Affirmative Action Board." Parsells responded on the same day with a memo that stated:
 
 
 8
 I am in receipt of your memo regarding your desire to meet with the Affirmative Action Board.
 
 
 9
 I am very disappointed in receiving notice of this action, since you requested I look into this situation. This action will not allow the time to review the issues presented by Ms. Cutlip and yourself, put my findings in writing, and meet with both of you about my findings in an attempt to resolve the issues. This is especially disappointing since I summarized what my actions and timeframe would be at the end of our meeting on July 29th, and no one voiced objection to my summary, and I basically received consensus from all parties.
 
 
 10
 I find this action premature, and definitely inappropriate, after our meeting of yesterday. I will still proceed to look into the issues of this matter.
 
 
 11
 Despite Parsells' request for more time to address the conflict himself, the plaintiff submitted a memorandum to Ken Dahms on July 31, 1987, requesting a meeting with the Affirmative Action Board. Dahms called the plaintiff to inform her that the Affirmative Action Board only coordinated minority recruitment; resolution of grievances fell outside the Board's area of responsibility. Consequently, Dahms instructed the plaintiff to take up her complaints of racial discrimination with the administrator of her division.
 
 
 12
 Meanwhile, Parsells completed his consideration of the ongoing dispute between the plaintiff and Cutlip by concluding that, although he would not assign blame, the working relationship between the two women was irreparable. Accordingly, Parsells decided to separate the two by transferring the plaintiff to a job under the supervision of someone other than Cutlip. Parsells found a position for the plaintiff in the Bureau of Alcoholism Services that involved the same type of work and the same classification as her job under Cutlip. The position, however, required the plaintiff to move to a new office and to work on Wednesdays from noon to 8:30 p.m., rather than during standard working hours. On August 5, 1987, Parsells informed the plaintiff that he intended to transfer her to separate her from Cutlip, and a written memorandum issued two days later memorialized the terms of the transfer which was to take place effective August 24, 1987.
 
 
 13
 On August 17, 1987, attorney Linda Stukey wrote to the Commissioner and the Equal Employment Opportunity Officer of the Health District on the plaintiff's behalf. Attorney Stukey's letter styled as a "Formal Grievance and Formal EEO Complaint" provided point-by-point assertion of the plaintiff's charges of disparate treatment, but included no allegations of any racial epithets. Instead, the letter focused on telephone use and responsibility, work instructions and assignments, charges of tardiness, inconsistencies with regard to closed-door policies, and the plaintiff's involuntary transfer to the Bureau of Alcoholism Services.
 
 
 14
 In response to attorney Stukey's letter, an informal grievance hearing took place before William Bines, the acting director of Environmental Health. Plaintiff Nelms and the Health District were both represented by counsel, and each side had the opportunity to call an unlimited number of witnesses and make opening and closing statements. Following sixteen hours of proceedings spanning four sessions, Bines issued a lengthy decision including extensive findings of fact and analysis of each allegation of discriminatory treatment. (App. 97-116). The decision includes no reference whatsoever to racial slurs or epithets directed at the plaintiff,[2] but contains exhaustive discussion of Cutlip's seemingly overbearing supervisory style and the plaintiff's repeated challenges to Cutlip's authority. Bines ultimately concluded that the plaintiff had not been subjected to racial discrimination, and ruled that the involuntary transfer was neither retaliatory nor impermissible. The plaintiff appealed Bines' decision to Health Commissioner Morton Nelson, who affirmed the ruling characterizing Parsells' transfer order as "the wisest course of action under the circumstances and well within his managerial prerogatives as a supervisor." Nevertheless, because the transfer was involuntary but not disciplinary, Nelson ruled that the plaintiff "shall have the right of 'first refusal' to transfer into any posted vacancy within the Division of Personal Health having a classification identical to that held by [the plaintiff] at the time of such transfer."
 
 
 15
 The plaintiff's term of service in the Bureau of Alcoholism was, at best, uncomfortable for all involved. The plaintiff alleges that she was harassed through petty reprisals, while her co-workers twice reported smelling alcohol on her breath after lunch. The plaintiff's annual evaluation in March of 1988 produced scores far lower than her performance ratings during her previous years with the Health District. Although the plaintiff received an overall rating of "Meets Requirements," she refused to acknowledge receipt of her evaluation. In May of 1988, the plaintiff was hospitalized for treatment of emotional difficulties. She exercised her right of first refusal on October 11, 1988, to obtain an "Administrative Typist I" position in the Personal Health Services Division. One year later, she received reclassification as an "Administrative Typist II," a position which she apparently still holds.
 
 
 16
 After unsuccessfully seeking relief through the Ohio Civil Rights Commission, the plaintiff filed this action against the Health District, Parsells, and Cutlip. An October 1989 bench trial before a United States magistrate resulted in the Rule 41(b) dismissal of the plaintiff's section 1981 and section 1983 procedural due process claims, and the entry of judgment following trial for the defendants on all of the plaintiff's remaining claims of discrimination and harassment.[3] Specifically, the magistrate concluded that the plaintiff's requested reclassification as an "Administrative Typist II" did not constitute a promotion covered by section 1981, that the plaintiff had no property interest in her job triggering due process requirements prior to involuntary transfer, and the plaintiff failed to establish that she was the victim of racial slurs, race-based disparate treatment, retaliation, or harassment. The plaintiff appealed the magistrate's disposition of each claim, arguing that the district court erred in resolving the factual disputes underlying her various legal theories. We shall address each of the plaintiff's claims individually.
 
 II.
 
 17
 According to Federal Rule of Civil Procedure 41(b):
 
 
 18
 After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.
 
 
 19
 When a defendant moves for dismissal under Rule 41(b), "[t]he court as trier of the facts may then determine them and render judgment against the plaintiff...." See Fed.R.Civ.P. 41(b). In weighing the evidence and determining the facts as contemplated by Rule 41(b), " 'the judge makes no special inferences in favor of the plaintiff.' "[4] Haskell v. Washington Township, 864 F.2d 1266, 1274 (6th Cir.1988). Consequently, "a Rule 41(b) dismissal 'operates as an adjudication upon the merits ... subject to the clearly erroneous standard of review.' " Id. (collecting cases); see also Romain v. Kurek, 836 F.2d 241, 245 (6th Cir.1987).
 
 A. The Section 1981 Claim
 
 20
 Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States ... the same right ... to make and enforce contracts ... as is enjoyed by white citizens[.]" 42 U.S.C. Sec. 1981. In Patterson v. McLean Credit Union, 109 S.Ct. 2363 (1989), the Supreme Court held that "racial harassment relating to the conditions of employment is not actionable under Sec. 1981 because that provision does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." Id. at 2369. Thus, as the magistrate correctly ruled, the plaintiff could not assert a section 1981 claim predicated upon alleged racial harassment. See id. at 2373-75.
 
 
 21
 The plaintiff notes that Patterson left some leeway for claims based on discriminatory refusal to promote. As the Patterson Court explained, however, "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under Sec. 1981." Id. at 2377. Here, the magistrate "was not persuaded that the reclassification was a true promotion within the meaning of Patterson...." Whether reclassification amounts to a promotion is a factual finding, see Rodriguez v. General Motors Corp., 904 F.2d 531, 534-35 (9th Cir.1990), and we cannot say that the finding in this case--that the plaintiff's desired reclassification involving increased salary and responsibility did not constitute an actionable denial of promotion--is clearly erroneous. Cf. Malhotra v. Cotter & Co., 885 F.2d 1305, 1311 (7th Cir.1989) ("Complaints about discrimination in routine 'promotions' ... [involving] a raise, rather than a transfer to a new job[,] can no longer be litigated under section 1981.").
 
 
 22
 Additionally, we do not detect clear error in the magistrate's alternative ruling that "the reason for denying the reclassification was Plaintiff's deficiencies in dependability which are objectively documented." Therefore, because the plaintiff failed to establish that intentional discrimination formed the basis for denial of reclassification, we conclude that her section 1981 claim was properly dismissed under Rule 41(b). See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982) ("Sec. 1981 ... can be violated only by purposeful discrimination").
 
 
 23
 B. The Section 1983 Procedural Due Process Claim
 
 
 24
 The plaintiff's section 1983 procedural due process argument focuses exclusively upon defendant Parsells. In the plaintiff's view, her inability to obtain review through anyone other than Parsells or his Health District associates rendered the review process constitutionally flawed. We disagree. Even in the case of discharge, as opposed to transfer, an employee is entitled to nothing more than a pre-termination hearing that "need not be elaborate." See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985). In fact, the hearing need not be anything more than "a right of reply before the official responsible for the discharge...." Duchesne v. Williams, 849 F.2d 1004, 1005 (6th Cir.1988) (en banc), cert. denied, 109 S.Ct. 1535 (1989). As our en banc decision in Duchesne clearly indicates, a pre-deprivation hearing "before a neutral and impartial decisionmaker" is not constitutionally mandated. See id. (emphasis omitted). Because the plaintiff was given an opportunity to meet with her ultimate supervisor, Parsells, prior to her involuntary transfer, no procedural due process violation predating her transfer occurred. Moreover, her post-transfer hearing, which was conducted before neutral arbiter William Bines, when considered in conjunction with her use of administrative and judicial avenues of post-transfer process, completely undercuts any argument that a procedural due process violation occurred following her transfer. In sum, we find that the magistrate correctly dismissed the plaintiff's section 1983 procedural due process claim.[5]
 
 III.
 
 25
 Federal Rule of Civil Procedure 52(a) requires the court in a bench trial to "find the facts specially and state separately its conclusions of law thereon[.]" Here, the magistrate determined that the plaintiff had not been subjected to racially motivated discrimination or harassment. Because this determination is a finding of fact, see Anderson v. Bessemer City, North Carolina, 470 U.S. 564, 573 (1985), and findings of fact under Rule 52(a) "shall not be set aside unless clearly erroneous," see Fed.R.Civ.P. 52(a), we must defer to the magistrate's determination unless our review of the evidence leaves us with " 'the definite and firm conviction that a mistake has been committed.' " Anderson, 470 U.S. at 573 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).
 
 A. The Title VII Retaliation Claim
 
 26
 Title VII expressly proscribes retaliation against anyone who "has opposed any practice made an unlawful employment practice" by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the statutory scheme.[6] See 42 U.S.C. Sec. 2000e-3(a). In Canitia v. Yellow Freight System, Inc., 903 F.2d 1064 (6th Cir.1990), we set forth the elements that a plaintiff must prove to establish a prima facie case of retaliation:
 
 
 27
 (1) that [s]he engaged in an activity protected by Title VII; (2) that this exercise of h[er] protected civil rights was known to defendant[s]; (3) that defendant[s] thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.
 
 
 28
 Id. at 1066. Here, the plaintiff contends that her request for a hearing before the Affirmative Action Board amounted to protected activity under Title VII, and her subsequent involuntary transfer constituted adverse employment action resulting from her attempt to obtain a hearing. The magistrate did not reject either of these contentions, but found no causal link between the plaintiff's protected activity and her involuntary transfer. The transfer, according to the magistrate, was the only method by which the plaintiff and defendant Cutlip could be separated because no position existed in the Health District to which Cutlip could be laterally transferred. Therefore, Parsells' well-founded conclusion that the plaintiff and Cutlip could not work together, rather than the plaintiff's endeavors to initiate the grievance process, formed the basis for the decision to laterally transfer the plaintiff. On the record before us, this determination is not clearly erroneous, and thus must be accepted.
 
 
 29
 B. The Title VII and Section 1983 Harassment Claim
 
 
 30
 The plaintiff's harassment claim flows from the protection against a hostile work environment implicit in 42 U.S.C. Sec. 2000e-2(a). See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 63-66 (1986). Because claims of harassment are grounded in the prohibition of practices that affect "terms, conditions, or privileges of employment," cf. 42 U.S.C. Sec. 2000e-2(a)(1), harassment does not rise to an actionable level unless it is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " Meritor Sav., 477 U.S. at 67. In the case of racial harassment, the "pervasive" misconduct standard translates into two requirements: " 'repeated slurs and management's tolerance and condonation of the situation.' "[7] Davis v. Monsanto Chem. Co., 858 F.2d 345, 349 (6th Cir.1988), cert. denied, 109 S.Ct.3166 (1989); but see Risinger v. Ohio Bureau of Workers' Compensation, 883 F.2d 475, 485 (6th Cir.1989) (arguing that, after Patterson, 109 S.Ct. 2363, racial harassment claims must be judged by the same standard applicable to sexual harassment claims enunciated in Rabidue v. Osceola Ref. Co., 805 F.2d 611, 619-20 (6th Cir.1986), cert. denied, 481 U.S. 1041 (1987)). In this case, the magistrate found that no racial slurs were directed at the plaintiff despite her testimony to the contrary. The magistrate predicated this determination upon the absence of any reference to racial epithets in any of the plaintiff's memos or documents enumerating her complaints as well as the categorical denial of the plaintiff's testimonial charges by other witnesses. Because the magistrate's finding is not clearly erroneous, the plaintiff's harassment claim must fail.
 
 
 31
 C. The Title VII and Section 1983 Discrimination Claim
 
 
 32
 "Both Title VII and section 1983 provide relief for discriminatory employment practices of public employers." Gutzwiller v. Fenik, 860 F.2d 1317, 1325 (6th Cir.1988). As we have stated, however, "[d]isparate treatment claims brought under either statute require proof of purposeful discrimination." Kitchen v. Chippewa Valley Schools, 825 F.2d 1004, 1011 (6th Cir.1987). Thus, "[i]n order to maintain a disparate treatment claim, [the plaintiff] must produce evidence that, because of [her] race, [she was] treated less favorably than similarly-situated white employees." Davis, 858 F.2d at 347. The magistrate specifically found that the plaintiff "has not proven that she was treated differently from similarly situated Caucasian employees and that in any event the treatment which she did receive which she perceived as adverse was not motivated by racial discrimination." The record reflects that nearly all of the mistreatment alleged by the plaintiff consisted of Cutlip's unyielding enforcement of conditions prevailing throughout the office or grew out of the acrimonious relationship between the plaintiff and her supervisor, Cutlip. The magistrate was not clearly erroneous in concluding that the mistreatment which the plaintiff perceived was the product of interpersonal animosity, not racial animus.
 
 
 33
 D. The Conspiracy Claim Under Sections 1985(3) and 1986
 
 
 34
 The plaintiff seemingly has abandoned her claims under 42 U.S.C. Secs. 1985(3) and 1986, which generally prohibit private conspiracies to deprive "any person or class of persons" of civil rights. See, e.g., Griffin v. Breckenridge, 403 U.S. 88, 101-02 (1971). Here, as in Donald v. Wilson, 847 F.2d 1191 (6th Cir.1988), "[s]ince all of the defendants were public officials and were admittedly acting under color of law, there was no need to assert a claim under section 1985(3)" or section 1986. See id. at 1194. The section 1983 theories fully encompassed the substantive claims asserted by the plaintiff. See id. Because the plaintiff did not prevail on any of her section 1983 claims, her section 1985(3) and section 1986 claims likewise must fail for want of an underlying civil rights violation.
 
 AFFIRMED.[8]
 
 
 [1]
 According to 28 U.S.C. Sec. 636(c)(1), a district court "with the parties' consent" may refer a case to a United States magistrate "to conduct civil proceedings and to order the entry of judgment...." Howes v. United States, 887 F.2d 729, 731 n. 5 (6th Cir.1989). Following the entry of judgment, "an aggrieved party may appeal directly to the appropriate United States court of appeals from the judgment of the magistrate in the same manner as an appeal from any other judgment of a district court." 28 U.S.C. Sec. 636(c)(3)
 
 
 [2]
 Vanessa Howard, a black woman who shared an office with the plaintiff, stated that Parsells once said to her, "How now black cow." With regard to statements that the plaintiff characterized as aimed at her and racially motivated, however, Howard consistently expressed the opinion that the comments were neither racially motivated nor imbued with racial hostility or sentiment
 
 
 [3]
 We note, however, the magistrate's finding that there was sufficient evidence to conclude Mr. Parsells harbors inappropriate racial attitudes, which at times he has inappropriately expressed. Magistrate's Findings at p. 8
 
 
 [4]
 In this respect, a Rule 41(b) motion for dismissal in a bench trial differs markedly from a Rule 50(a) motion for directed verdict in a jury trial. See Hersch v. United States, 719 F.2d 873, 876-77 (6th Cir.1983)
 
 
 [5]
 The availability of constitutionally sufficient process in this case makes consideration of an underlying property right unnecessary. See also Duchesne, 849 F.2d at 1006 & n. 1. We note in passing, however, that the plaintiff's right to procedural due process depends upon her "having had a property right in continued employment." See Loudermill, 470 U.S. at 538 (footnote omitted). Such property rights typically "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." Board of Regents v. Roth, 408 U.S. 564, 577 (1972); accord Cremeans v. City of Roseville, 861 F.2d 878, 880-81 (6th Cir.1988), cert. denied, 109 S.Ct. 2065 (1989). Here, the plaintiff has not identified any source of a property right in maintaining her desired position, and the record strongly suggests that no such interest preventing involuntary, lateral transfer within the Health District exists as a matter of state statutory or contract law
 
 
 [6]
 This proscription of retaliation cannot support an independent claim under section 1983; Title VII provides the only method for obtaining redress for such retaliatory conduct. See Day v. Wayne County Bd. of Auditors, 749 F.2d 1199, 1205 (6th Cir.1984)
 
 
 [7]
 We held in Risinger v. Ohio Bureau of Workers' Compensation, 883 F.2d 475 (6th Cir.1989), that "the required elements of prima facie proof necessary for a plaintiff to prove a cause of action charging a racially hostile work environment both under Title VII and 42 U.S.C. Sec. 1983 are the same." Id. at 483. Therefore, our analysis of the plaintiff's Title VII harassment claim applies with equal force to the harassment component of the plaintiff's section 1983 claim
 
 
 [8]
 In her reply brief, the plaintiff raises an objection to the award of costs included in the magistrate's disposition of the case. Federal Rule of Civil Procedure 54(d) states that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs[.]" We likewise have indicated that "the trial court, in the sound exercise of its discretion, may tax the costs of litigation against a losing party." Jones v. Continental Corp., 789 F.2d 1225, 1233 (6th Cir.1986). Neither the fact that this is a civil rights case nor the plaintiff's alleged indigency precludes an award of costs. See id. Nevertheless, the magistrate may consider the plaintiff's assertion of indigency in establishing the amount of costs to be assessed. See, e.g., In re Ruben, 825 F.2d 977, 987 (6th Cir.1987), cert. denied, 485 U.S. 934 (1988)